Filed 7/20/16  In re Kaitlyn S. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

In re KAITLYN S., a Person Coming Under the Juvenile Court Law.

---

SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,

        Plaintiff and Respondent,

        v.

TIFFANY D.,

        Defendant and Appellant.

D069787

(Super. Ct. No. J518997C)

APPEAL from an order of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Suzanne F. Evans, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Tiffany D. appeals an order of the juvenile court continuing its dependency jurisdiction of her minor daughter, Kaitlyn S. The sole issue raised by Tiffany's appeal is her contention that the juvenile court erred in finding she received reasonable services. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

Tiffany and her boyfriend Stuart S. have had an ongoing relationship since 2007 and are the parents of Kaitlyn, born in 2010. Tiffany also has three older sons, who are not parties to this appeal, by two different fathers: Skyler and Daniel, born in 2004 and 2005 respectively, and who share a father, James S.; and Hunter, who is 15 and is in the custody of his father, Jason R. Stuart also has a son from another relationship, Christopher, who was born in 2003.

The San Diego County Health and Human Services Agency (Agency) became involved with the family in 2012 after Tiffany alleged Skyler and Daniel were sexually abused by Christopher. As a result of the allegation, the family was provided with voluntary services and Christopher moved into his paternal grandmother's home. At the time of that voluntary case, Skyler was living with his maternal grandmother, Claudia D., because Tiffany could not cope with Skyler's aggressive behavior. In connection with the case, Tiffany, Skyler and Daniel began seeing an Agency approved therapist in early 2014. In February 2014, Skyler moved back in with Tiffany, Stuart, Daniel and Kaitlyn.

In April 2014, the Agency received a new referral concerning Daniel's and Skyler's behavior. Tiffany told the Agency's social worker that the boys were collecting knives to take to school to stab another student, that Daniel was making weapons out of

2

household items, that she was calling the police several times a week because of the boys' behavior, and that Daniel and Skyler were physically assaulting each other, Kaitlyn and Tiffany. As a result, Tiffany entered into a voluntary safety plan with the Agency that required Kaitlyn to stay with Claudia. Over the course of the next six weeks, Tiffany and Claudia contacted the Agency's social worker frequently about the boys' disturbing behavior.

On May 30, 2014, Tiffany took Daniel and Skyler to Polinsky Children's Center (PCC) and told PCC staff she could not care for them. Tiffany stated she felt like she was going "to snap" and hurt them, and that "either they will die or I will die." In her interviews with the Agency's social worker, Tiffany stated that she had suffered from depression in the past and was currently taking medication for anxiety. Tiffany also stated she had been diagnosed as bipolar, but could not remember when that diagnosis was made or who made it, and that she was currently being evaluated for autism.

Two days after Tiffany left Daniel and Skyler at PCC, the Agency filed petitions under Welfare and Institutions Code[1] section 300 on behalf of Kaitlyn, Skyler and Daniel. The petition for Kaitlyn alleged she was inadequately supervised by her parents, and had been hit by Daniel and inappropriately touched by Skyler. The petition stated Tiffany was "unable to control the violent behaviors within the home which place[d]" Kaitlyn at risk of serious physical harm or illness. At the detention hearing, the juvenile

---

[1]     All subsequent statutory references are to the Welfare and Institutions Code.

court ordered liberal supervised visitation and reunification services for Tiffany and Stuart.

Thereafter, Kaitlyn remained in Claudia's care and Tiffany began to receive reunification services. She continued with the same therapist she began visiting earlier in the year, Jeanine Sachs. In the Agency's August 2014 report for the jurisdiction and disposition hearing, Sachs reported that Tiffany attended therapy weekly and sometimes participated in joint sessions with Kaitlyn. In late June, Tiffany told the Agency social worker she was doing better with Skyler and Daniel out of the home and that she was receiving the treatment she needed, including going to weekly therapy with Sachs, taking medication for her anxiety, and that she had enrolled in a parenting course. Tiffany also gave the social worker the names and dosages of her medication and the name of her prescribing physician.

The jurisdiction and disposition hearing took place on September 18, 2014. The juvenile court found the allegations in the petition true and placed Kaitlyn with Tiffany and Stuart.[2] The court also continued services for both parents and found the case plan developed by the Agency was appropriate, reasonable and likely to be successful in alleviating the problems that brought Kaitlyn under the court's jurisdiction.

On December 5, 2014, the Agency received a new referral alleging that Stuart had punched holes in the walls of the family's home, hit and forcefully pushed Kaitlyn, Daniel and Skyler, yelled at Kaitlyn and Tiffany, and drove with Kaitlyn in the car under

---

[2]    Skyler and Daniel were placed with a foster family.

4

the influence of marijuana. When interviewed by the Agency's social worker, Tiffany confirmed the allegations against Stuart and told the social worker she had taken Kaitlyn to stay with Claudia because she was fearful of Stuart. Tiffany described Stuart as being abusive and told the social worker she wanted to leave him but didn't know where to go. She also alleged that one of the reasons she brought Skyler and Daniel to PCC in May was to protect them from Stuart. The social worker referred Tiffany to a domestic violence shelter, but Tiffany declined that assistance.

In her interview, Claudia told the social worker that Tiffany had been hearing voices and that Tiffany said "she felt free" once she left Kaitlyn with Claudia. Claudia also told the social worker that she had seen Stuart be verbally abusive to Tiffany and the minors, and that Kaitlyn was acting abnormally clingy and insecure. A supervisor at Kaitlyn's preschool also reported that Kaitlyn had missed a lot of school and had been having stomach problems. Stuart denied all of the abuse allegations. He admitted he smoked marijuana, but stated it was for medical reasons and gave the social worker a copy of his medical marijuana card.

As a result of the new allegations concerning Stuart's behavior and its concern over Tiffany's mental health, on January 15, 2015, the Agency filed a supplemental petition on behalf of Kaitlyn under section 387. The petition alleged that Tiffany and Stuart were no longer able to care for or adequately supervise Kaitlyn because Kaitlyn had been exposed to Stuart "punching walls," "throwing toys at [Tiffany]," and because Stuart had grabbed Kaitlyn and thrown her on the bed. The petition also alleged that Stuart smoked medical marijuana while caring for Kaitlyn and that Tiffany was

5

"experiencing hallucinations, hearing voices and seeing snowy spots." At the detention hearing on the new petition, the juvenile court ordered Kaitlyn to remain in Claudia's custody and liberal supervised visits for both parents. At the initial jurisdiction and dispositional hearing on February 19, 2015, both parents contested the truth of the allegations in the petition and the juvenile court set the matter for an evidentiary hearing in March.

On March 3, 2015, before the hearing, the Agency received a new referral alleging that Stuart sexually abused Kaitlyn. The Agency suspended his visitation in order to conduct an investigation of the allegation. In the same time frame, Tiffany stopped seeing Sachs and began therapy with a new provider, but was dropped by the new provider after missing too many appointments. Tiffany also reported continued and increasing mental health concerns. She told the Agency's social worker that she had suicidal thoughts, that she stopped taking her medication because it was making her crazy, and that she was hearing " 'all kinds of stuff, seeing snowy spots' and had a 'few episodes' where she 'freaked out in public.' " She also reported hearing "voices telling her that she is a 'bad mother' that she is 'worthless' an 'idiot, a joke' and that she should 'give up' and that her children should be 'raised by someone else.' "

At the March 12, 2015 jurisdictional and dispositional hearing, the juvenile court found by clear and convincing evidence that the allegations in the section 387 petition were true, removed Kaitlyn from her parents and continued Kaitlyn's placement with Claudia. The court also found reasonable efforts were made to prevent removal, but that Tiffany's and Stuart's progress in alleviating the issues that brought Kaitlyn into the

6

court's jurisdiction had not been substantial. The court ordered supervised visitation for Tiffany and that the Agency provide the parents with services consistent with the case plans that were developed earlier in the proceeding. The plan included a requirement that Tiffany meet and work with a psychiatrist and take medication as prescribed, and that she attend therapy and participate in a domestic violence class. The court set the six-month review hearing for September 1, 2015.

In its report for the six-month review hearing, dated August 25, 2015, the Agency reported that in May, Tiffany had begun seeing a new therapist on a consistent basis. The therapist, Judith Rochelle, reported in June and July that Tiffany was cooperative, open and communicative, and that she did not see any evidence that Tiffany suffered from bipolar disorder. At that time, Rochelle believed Tiffany's mental health concerns were environmental. In August, Rochelle's assessment changed and she reported that Tiffany was experiencing more obsessive and anxious behaviors, and that a psychological evaluation would be valuable to clarify Tiffany's diagnosis. Tiffany reported that her mental health had improved and that she had stopped seeing snowy spots.

With respect to domestic violence services, the Agency reported that its staff psychologist was concerned that Tiffany's participation in domestic violence group therapy would be detrimental. As a result, the Agency sought approval from Rochelle before authorizing Tiffany's participation. In June, Rochelle informed the Agency that Tiffany would benefit from a domestic violence group. The initial service provider Tiffany selected did not have the capacity to take her, delaying the start. However, by the time of the Agency's August 25, 2015 report, Tiffany was approved with a different

7

provider and had been given two potential starting dates for services in late August and early September.[3]

In its August 25, 2015 report, the Agency recommended continued services for Tiffany and that her visits with Kaitlyn remain supervised. At the September 1, 2015 hearing, Tiffany contested the reasonableness of services provided to her and sought unsupervised visitation. The court set an evidentiary hearing for September 25, 2015. Before the hearing, the Agency modified its position to recommend unsupervised visits for both parents. At the hearing, however, Kaitlyn's attorney did not agree that unsupervised visits were appropriate and asked that the court conduct an evidentiary hearing before allowing unsupervised visits.[4] As a result of this request, the court continued the evidentiary hearing to November 16, 2015, and set a settlement conference for October 21, 2015.

---

[3] The Agency moved to augment the record on appeal to include its October 21, 2015 report filed in Skyler and Daniel's case (but not Kaitlyn's case), and for relief from filing the motion to augment late. The Agency's motion asserts the report contains pertinent information considered by the juvenile court before its ruling about the domestic violence services provided to Tiffany. Tiffany opposes the motion on the grounds that the information in the October 21, 2015 report is contained elsewhere in the record. The motion is granted. The report indicates that Tiffany did not start the domestic violence group on either date given by the service provider. Rather, on October 14, 2015, Tiffany told the social worker she was scheduled to start the group that day, but would start the following week because she did not have transportation. The social worker offered to drive Tiffany and took her to her first session on October 14, 2015.

[4] The attorney's concern stemmed from an August referral alleging Stuart sexually abused Kaitlyn. The Agency investigated the allegations and, after concluding there was no evidence of sexual abuse, closed the referral as being unfounded. The Agency also closed the March sexual abuse referral as inconclusive after two forensic interviews of Kaitlyn did not uncover any abuse by Stuart.

At the September 25, 2015 hearing there was also some discussion concerning Rochelle's suggestion that Tiffany undergo a psychological evaluation. Tiffany's attorney stated that Rochelle had resigned from the program through which the Agency was providing services and that Tiffany was in the process of locating a new therapist. Tiffany's attorney requested that Rochelle's August report, which contained the suggestion that Tiffany undergo an evaluation, be provided to him and to Tiffany's new therapist once established. The court ordered Rochelle to provide a written report to the parties, but declined to order that Tiffany undergo a psychological evaluation.

In advance of the October settlement conference, the Agency again recommended unsupervised visitation for both parents. The Agency also recommended that the court order a psychological examination for Tiffany. The issue of the psychological evaluation, however, was not addressed at the settlement conference. The Agency filed an ex parte application at the beginning of November seeking an order for a psychological evaluation for Tiffany. The ex parte application also explained that on October 28, 2015, Tiffany's new therapist reported that Tiffany was again suffering from auditory hallucinations. The court signed the order on November 9, 2015, and on November 16, 2015, the court continued the review hearing to January 22, 2016, to await the results of Tiffany's evaluation.

On December 14, 2015, Tiffany underwent a psychological evaluation conducted by Richard J. Jordan, Psy.D. Jordan diagnosed Tiffany with schizoaffective disorder, obsessive compulsive disorder and dependent personality disorder. Jordan also reported that there was "no evidence of clinically significant impairment in cognitive/intellectual

functioning that would preclude [Tiffany] from benefitting from services within the legal timelines for this case." Jordan opined that Tiffany's mental health had improved over the previous few weeks, which he attributed to Tiffany's consistency in her prescribed medication in that time frame, and that he expected continued improvement with sustained medication.

Jordan's report noted that Tiffany's inconsistency with her medication was not unusual for patients, like her, coping with manic symptoms. He recommended continued individual therapy and that Tiffany's therapist monitor and emphasize the importance of her psychotropic medication compliance. Based on Jordan's recommendations, the Agency amended Tiffany's case plan to include stabilizing her mental health by having regular appointments with a psychiatrist, taking medication as prescribed, attending therapy and domestic violence and nonprotective parent abuse courses, and participating in random drug testing.

The court held the six-month review hearing for Kaitlyn on January 22, 2016.[5] The court heard testimony from Tiffany, Claudia and the social worker assigned to the family, and accepted the Agency's reports into evidence. At the conclusion of the hearing, Tiffany's counsel argued the Agency failed to provide reasonable services, focusing primarily on Tiffany's need for domestic violence assistance. Tiffany's counsel argued the Agency knew Tiffany was in need of such assistance for five months before related services were added to her reunification plan, and the Agency waited two

_____

5    The hearing was combined with the 18-month review hearing for Daniel and Skyler, who remained in foster care.

10

additional months before providing her with such service. Tiffany's counsel also asserted that even once domestic violence support was provided, Tiffany had only had the opportunity to attend four sessions.

In response, the Agency's counsel argued the Agency had provided referrals for domestic violence shelters throughout the case, but that Tiffany had refused that assistance. Additionally, the Agency worked to provide domestic violence group therapy to Tiffany as soon her therapist indicated she should attend. The Agency asserted that any delays in obtaining the service were reasonable, or were related to Tiffany's resistance.

After the hearing, the juvenile court continued reunification services for Tiffany and Stuart, ordered unsupervised visitation for Tiffany, and set the 12-month review hearing for April 5, 2016. The court rejected Tiffany's assertion she had not been provided with reasonable services. The court found that because of the complex nature of the case, the Agency did not act unreasonably by waiting for Tiffany's therapist to assess whether domestic violence group therapy was appropriate. The court stated: "This is very much a case where we have very complicated factors that are fluid, are intertwined, and . . . particularly made more complicated . . . by [Tiffany's] self-reports for an extensive period of time that, once the children were out of the home, her relationship with [Stuart] was greatly improving, and that the household was more peaceful."

11

DISCUSSION

I

Whenever a minor is removed from parental custody, the court must order reunification services for the parents to remedy the problems that led to the minor's removal. (§ 361.5; *In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1362; *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 174.) Each reunification plan must be appropriate to the particular individual and based on the unique facts of the case. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) Provision of reunification services implements the law's strong preference for maintaining the family relationship whenever possible. (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1228.)

Services are considered reasonable if the child welfare agency has " 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents . . . .' " (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972.) The reasonableness of the Agency's efforts is judged according to the circumstances of each case. (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164 (*Robin V.*); *Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345.) Further, " '[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent.' " (*In re Nolan W., supra*, 45 Cal.4th at p. 1233.) There is no "requirement that a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions." (*In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5.)

12

We review the court's findings as to the adequacy of a reunification plan and the reasonableness of the Agency's efforts for substantial evidence. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 46; *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.)

II

Tiffany asserts the Agency was deficient in its provision of reunification services because it did not obtain a psychological evaluation or provide domestic violence treatment at an earlier stage of the proceedings. We disagree. There was sufficient evidence before the juvenile court to support its finding that the Agency provided Tiffany with services reasonably designed to identify and remedy the issues that led to Kaitlyn's dependency. Tiffany was dealing with a complex set of problems that seemed at the outset to stem from Daniel and Skyler's aggressive and dangerous behavior. Tiffany's mental illness and her relationship with Stuart were two of many challenges she faced in her efforts to reunify with Kaitlyn, and these issues did not come to the fore until months into the proceeding.

The Agency concedes its follow up concerning Tiffany's medication fell below what it considers to be best practices. The Agency, however, is not required to provide "the best [services] that might be provided in an ideal world." (*In re Misako R., supra*, 2 Cal.App.4th at p. 547.) Rather, the reasonableness of the services must be considered in relation to the circumstances of the case. (*Robin V., supra*, 33 Cal.App.4th at p. 1164.) When the case began Tiffany represented she was receiving treatment from a physician and regularly taking medication. She provided the social worker with her physician's name and the names and dosages of her medication. Further, Tiffany's therapist reported

13

in June and July of 2015 that Tiffany's mental health was stable and improving. These facts provide a reasonable explanation for the Agency's delay in obtaining a psychological evaluation.

Additionally, once the evaluation was performed, the primary treatment recommended by the evaluating psychologist (continued therapy with monitoring of Tiffany's medication compliance) was already underway. The psychologist also expressed his opinion that Tiffany did not have any "clinically significant impairment" preventing her from reunifying by the date of the 12-month review in February 2016. This evidence sufficiently supported the juvenile court's reasonable services finding.

With respect to Tiffany's assertion that the Agency failed to provide adequate services related to domestic violence, the record contradicts this claim. Tiffany did not report violent behavior by Stuart until December 2014. Thereafter, she minimized his behavior and by the time the section 387 petition was filed in January 2015 she reported that her relationship with Stuart had improved. Tiffany also declined services that were offered to address this aspect of the case, including the Agency's referrals to shelters and the court's offer to issue a restraining order against Stuart. The Agency could not force Tiffany to access these services. (See *In re Michael S., supra*, 188 Cal.App.3d at p. 1463, fn. 5.) We also reject Tiffany's assertion that the Agency acted unreasonably by seeking her therapist's evaluation of her ability to benefit from domestic violence group therapy. In light of the complex nature of Tiffany's case, it was appropriate for the Agency to

14

consult with a mental health professional to determine whether such services were appropriate.[6]

In sum, the Agency made a good faith effort to identify and address Tiffany's problems, maintained consistent contact with Tiffany throughout the proceedings, offered consistent visitation, and provided ongoing services throughout. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) While we do not condone the Agency's delay in seeking a psychological evaluation for Tiffany earlier, we cannot say that insufficient evidence supported the court's finding that the services offered and provided to Tiffany were reasonable under the circumstances of her case.[7] (*In re Misako R., supra*, 2 Cal.App.4th at p. 547.)

---

[6]     Any delay resulting from the initial service provider not having the capacity to accommodate Tiffany was minimal. Indeed, when Tiffany's social worker learned Tiffany did not have transportation to start the domestic violence group therapy, she personally drove Tiffany to the provider.

[7]     Tiffany relies on *In re K.C.* (2012) 212 Cal.App.4th 323 (*K.C.*) and *Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397 (*Patricia W.*) to support her assertion that the provision of services was not reasonable. This reliance in misplaced. Unlike this case, both *K.C.* and *Patricia W.* involved orders terminating reunification services. (*K.C.*, at p. 325; *Patricia W.,* at p. 400.) Additionally, in *K.C.*, the social services agency failed to provide *any* assistance to the father to secure treatment for his diagnosed mental illness. (*K.C,* at p. 333-334.) Likewise, in *Patricia W.* the agency undertook no effort to confirm the mother's psychiatric diagnosis or to secure treatment for her mental illness. (*Patricia,* at p. 401.) The social service agencies' absent efforts in *K.C.* and *Patricia W.* are unlike the consistent efforts made in this case to assist Tiffany in obtaining and maintaining services for the evolving reunification issues she faced.

15

DISPOSITION

The order is affirmed.


                                                        HUFFMAN, Acting P. J.

WE CONCUR:


NARES, J.


McDONALD, J.

16